Good morning. May it please the Court, Michael Miguel for Exxon Mobil Corporation. This case is about whether the District Court appropriately applied substantive California law in, first, finding an ambiguity in a contract, second, determining the intent of the parties upon the finding of the ambiguity, and third, in imposing additional obligations on the parties that are nowhere to be found in the contract. Exxon Mobil respectfully submits that in finding each of those was error, and it all stems from the finding of an ambiguity in the first place. Now there has been some question amongst the parties in the briefs about the appropriate standard for this Court to look at this particular dispute. And we believe that California law is very clear that both with a District Court's interpretation and meaning of contract provisions, that is a de novo review, where a District Court is looking at whether there's an ambiguity in the first place, that in itself is also a de novo review. And we believe that by looking at this particular contract, there is no ambiguity. There can't be an ambiguity if the appropriate review of the contract itself and the actions of the parties and the appropriate extrinsic evidence is in fact looked at. Ginsburg. You know, I had a problem, because when I read the contract as a whole, it seemed very apparent that Exxon Mobil had agreed to be responsible for pre-contamination that it had caused before closing, and New West was going to be responsible for contamination it caused post-closing or new contamination that migrated on subject to certain limitations. And that makes sense of all of the indemnity provisions and et cetera. And that's what the District Court found. And I really had trouble reading the contract in any other way. It wouldn't really make sense. So maybe you could walk through some of the other provisions in the contract and explain how I could read it in some other way. Yes, Your Honor. And in fact, I would largely agree with Your Honor, except that what the contract says is it's what is found at the time of closing. Well, that's not actually so, because it says that first. And then it says on, let's see, Section 11b, and I guess this is where I ended up with the same problem Judge Acuda has, if further assessment or mediation of petroleum hydrocarbons is required by the governmental authority, the baseline condition of any property shall be modified as appropriate based on the results of such additional assessments and remediation if caused by Exxon's operations. So there's a causation notion which you claim doesn't exist, and there also is a, as I understand it, post-closing possibility of amending the baseline condition. Well, to the first point, that provision is inconsistent with other parts of the contract that says that there is going to be releases and indemnities from the purchaser after the closing date. You know, when I read through those, it seemed that they limited New West to its remedies under the contract with respect to the pre-closing contamination. And then ExxonMobil indemnifies New West, whereas in the release and the whole term it says there's no indemnity. But ExxonMobil indemnifies New West for the pre-closing contamination. And so if ExxonMobil did nothing and the Environmental Management District came after New West and said, you know, you're the owner of possession, you have to clean up, they would just tender that to ExxonMobil. I mean, if you see the pre-closing, post-closing divide, it seems to make perfect sense. Well, what is clear, Your Honor, is that this contract was meant to provide certainty to the parties. And the interpretation of the district court provides no certainty. It basically makes ExxonMobil a guarantor for everything that is ever found out there under three criteria that are not found in this contract. Well, it may have been misdrafted, but, you know, in response to the sentence I just read, you basically said, well, I should read it out. And you can't do that. No, Your Honor. I don't believe it should be read out, but it should be read as a whole. And it all goes back in the first instance to what the definition of baseline condition is. But, you know, the other thing that was puzzling to me was that ExxonMobil acted consistently with my reading of the contract, which is it submitted the documents to the Environmental Management District. They said you have to delineate the contamination. ExxonMobil went and started, began to delineate it. And it was really only when you found the spikes in the MTV, which you suspected were from a new release, a post-closing release, that you sent a demand letter to New West. That seems perfectly consistent with the pre-closing, post-closing divide. Well, it is perfectly consistent with the pre-closing, post-closing divide of what was known to be in the ground at the time of the close of escrow. And that's what the baseline condition is. But nothing was known. You had one groundwater sample. You didn't discharge your obligation under the contract, which says if you find contamination, that triggers an alarm, then you're going to do additional assessment. So you didn't really know what was in the ground. You just knew it was in one groundwater sample. Well, the post-closing activity that Your Honor just referred to was, in fact, doing what Judge Berzon meant, was going forth and doing the investigation to clean up and find out what was known at the time of closing. I would respectfully disagree that that post-close activity has anything. So what – let me back up a minute. A lot of the fighting in the briefs, or a lot of the disagreement in the briefs and at district court, was about this question of what level means. Yes. I don't see why it matters. I'm willing to assume that you're right. I think you probably are, that level means or could mean a concentration level. But I don't see how that helps you very much because of the language that Judge Yakuta's been talking about and the language I'm talking about. I don't know what it can – when it says that you can modify the baseline condition as appropriate if caused by Exxon's operations, what do you think it means? Well, first off, there's been no showing that the increases was due to Exxon's operations. In fact, the only evidence was that it wasn't. Now, the district court made a finding. It listened to all the evidence, and it made a finding that the spikes in the MTVE were not caused by new releases from New West. Now, that may have been right. It may have been wrong. And I guess my first question would be, are you arguing that to us, that the district court was clearly erroneous in finding that the MTVE spikes were not caused by further releases by New West? Yes, Your Honor. But before you get to that point, we believe that the genesis of everything that the trial court found, the district court found, revolves around the misinterpretation and misapplication of what a baseline condition was. And because the term level was used in – is – was, frankly, respectfully to Judge Shub, tortured, because if you look at the entire contract, you have to determine that level is a concentration, not a volume or mass. So why does that matter? It matters because then he went and looked at the trial court, looked at every other issue with the mindset that I have – you have not proven me – to me that the volume or mass isn't from you. And so therefore, he's imposing an obligation nowhere found in the contract that you make a source determination. But the reasons he found that – well, first of all, it wasn't clear to me that he wasn't doing the second inquiry and the alternative. In other words, it wasn't plain to me that his damages discussion wasn't assuming your construction of level. And if you read through it, it seemed at some point that he was. But second of all, do you agree with that? Was that an alternative ruling, or was that a ruling dependent on his construction of level? Well, I think it's dependent, and it's – to borrow from the criminal law that we've been hearing, it's fruit of the poison tree, because before he even gets into whether the damages were appropriate and proven, he has already decided that I have to show the cause, the source, and prove the negative that it wasn't caused after the close of escrow. And those three obligations are nowhere to be found in this contract. But those have nothing – that's my point. Those three things have nothing to do with whether level means a concentration or an amount. So that issue doesn't seem to have infected the fact findings. That's – or why has it infected the fact? You said so, but it doesn't seem to me to be right. Well, it does – going back to something that Judge Akuta said was whether the obligation to find the appropriate levels was discharged at the time of the close of escrow. And what the contract says is that the baseline condition is going to be set in the most recent report. Now, it may – And modified later. Possibly, if further work is required by the Federal government. Which it was. And it's caused by Exxon's operations. Right. Which is not proven. That's what the district court found. I mean, the district court made that finding that that contamination was caused by Exxon's operation, rightly or wrongly. Yes. That's what we would call the immaculate gas station. That for that to be right, New West Petroleum, using the gas tanks and the pumps, putting millions of dollars – or millions of gallons of gas through that, never contributed one molecule to the contamination out there. All right. So this is what we're trying to get. So therefore, you are claiming that the district judge was in clear error as to that finding. Yes, Your Honor. All right. So why? The record showed at least two separate pieces of evidence that could not possibly be explained by Exxon Mobil having caused the contamination. The most important being, in 2004, the finding of ethanol in the grounds. Ethanol is an additive that was added to gasoline to replace MTBE. MTBE is an additive that was used in the 1970s to be a power booster for unleaded gas. And when it was phased out, ethanol was used. There was also additional contamination that was found in the soil at levels, surficial levels, that could not have possibly been there nine years after Exxon Mobil was out. So we believe that that's clear error as well. Now, when the trial court looked, once an ambiguity was determined, which we think was wrong, the extrinsic evidence that he looked at to find out that it meant mass or volume, we believe, was incorrect. Because California law is the objective theory of contract. It's what do the words mean, not what a single party intended. And there's no way to justify what one party thought as opposed to what this entire contract means. And moreover, all of the reference in sections 12 and 19 elsewhere in the contract where the term level was used, it's referring to the ex marin. Kagan. Can I make a suggestion? Yes. It is useful when you're doing an appellate argument to listen to what's troubling the judges, right? We've told you what's troubling us and it would be useful to hear that. It doesn't have to do with whether the contract means level or amount. It is whether the judge was in clear error in his determination as to the cause of the contamination that was found in the spikes. And to keep going back to the other issue is really not helpful to you and not helpful to us. Well, as stated previously, we believe that there was clear error because of the least two evidence, two pieces of evidence that demonstrate that there was contamination events that could not have possibly been caused by Exxon that were not taken into account by the district court. There was evidence that was provided that talked about the contamination, who caused it. There was expert and witness testimony, largely uncontroverted. But yet the court committed clear error by relying upon experts that spoke in the hypothetical. The court relied upon an expert New West Petroleum brought up that said there could be a 20 percent margin of error and that could explain all the contamination. On cross-examination, he said he had no evidence that there was any margin of error in these particular samples. So what it was, it was theoretical opportunities to get to where the court wanted to go instead of looking at the evidence that was before the court. You want to reserve time. I would like to. Thank you very much.  May it please the Court. Spencer Melisiak representing the New West Appellees. To boil down the dispute between the parties, I think it's fair to say that Exxon relies on the concept that the contract sets up a static method of determining what the baseline condition would be. New West looks at it as a contract determining the baseline condition through a dynamic or continuing process. The other issue that really comes before the court is whether or not there was a new release after the close of escrow to the sale to New West. In both cases, Judge Shub found that the contract was dynamic and that there was no evidence that there was a new release after the sale to New West. So if we decided that Judge Shub was wrong as to the meaning of level, just as a matter of plain words and context, would that matter to your argument or to the result? Well, I believe that with respect to the dynamic, we believe Judge Shub was right in finding that. Not the dynamic. The concentration versus the amount or volume. In this particular case, I'm not so sure it does because Exxon's obligation under the contract is to clean up all the contamination that it caused. We believe it's much easier if there is an amount to determine what that amount was. Nevertheless, if there's no new release, the concentration would be sufficient in this case to define Exxon's obligation. It seems everybody's talking concentration. The letters from the government are always talking concentration. It seems to be traditional in this area. But I'm not sure why it matters. Your Honor, if I may, I would believe that it's not as clear cut that concentration runs throughout the whole area of environmental law. In fact, there's discussion in the briefs about a written report that must be filed by Exxon in this case within five days of finding the initial release. Under Health and Safety Code Section 25295A1, that written report is supposed to state the nature and volume of the release. Additionally, Exxon's own contract under Paragraph 11B states that the written report is to delineate the amount and location of the contamination. So it's really the question of whether or not it's stated in concentration versus in amount is defined by Exxon's own contract itself. So the Environmental Management District would say you have to remediate to this concentration, I guess. Yes, concentrations, that was stated by the experts at the underlying trial. It's not a reliable method of determining the amount or volume of a person's contamination to the property. For example, there was evidence that the concentration can fluctuate depending upon the groundwater levels. Groundwater can rise and dissolve MTBE that's locked in the soil. But there is, I mean, the example you gave before, as I understand it, at the time of the release. So then you can know what the amount of the release is. But when you're trying to do it retrospectively, I don't see how you can do anything other than a very rough estimate of amount anyway. It's going to be extremely ballpark, if even that. Yes. I think the key really, Your Honor, is whether or not Exxon proved his case that there was a new release. If Exxon, if the judge was right in finding that there is substantial evidence to support his finding that there is no new release, I think that's the end of the discussion. Now, the lab reports or the analyses were pretty stark, that the concentrations were at a certain level, of MTBE were at a certain level. And then there's an enormous order of magnitude spike. So explain, and opposing counsel mentions the detection of ethanol, the detection of additional soil contamination. Explain why Judge Shub's determination wasn't clear error. The Exxon relied upon its own expert witness, which was Mr. Searcy, to try and show there was a new release. Judge Shub found that his testimony was not credible. And the reason he found him not credible was Mr. Searcy stated that if there was a release, it would take at most 40 days for that contamination to move through the soil into the groundwater. Now, despite that testimony, the facts of the case were that right after New West got the station, it closed the station down for six months to install new equipment, which was state-of-the-art and did not sell any fuel during that period of time. Nevertheless, the concentration report in the groundwater continued to increase while the station was closed. That would show that there's MDBE that's moving through the soil into the groundwater. Obviously, that contamination had to be Exxons, because New West could not have contributed to that. Additionally, Judge Shub relied at the order of magnitude that anywhere close to where it ended up. I don't remember the numbers. It went, it increased up to, I believe, 6,500 during the period of time. I know there was a finding of three. Did it end up going to like 90,000 or something? No, it never. I'm sorry, Your Honor. It never reached that level. I think the highest concentration was at around 37 parts per billion, and that was subsequent to New West's ownership and operation of the station. The main level or concentration that Exxons were relying upon to try and show there was a new release was the one for the test done in April of 2000, where it increased to 28,000, and that's the order of magnitude that Exxon discusses. However, on April 13th, about a week later, Exxon had, or excuse me, New West had the tracer test done, which showed that the system tests tight. Now, the tracer test is the most thorough test that can be used to test the integrity of the system. Nevertheless, New West passed with a perfect score. That undercut Exxon's argument that there was a new release that would have been detected within the prior week. So there was conflict in testimony at trial in the district court could reasonably make a determination. Is that your... Yes. Ours is that there was substantial evidence to support Judge Shub's position. And he found Mr. Searcy to be uncredible because of the fact that there was a continuing increase while the station was closed, plus the fact that MTBE was located in the soil about 13 months after Dr. Baines testified he stopped selling fuel that contained MTBE because the state, quite frankly, said no more MTBE is to be in the fuel. So based on Mr. Searcy's travel time, it would not have been possible for MTBE to still be in the soil. Once his testimony falls apart, then you look back and say, well, this contamination then existed at the time of the close. And that's what Judge Shub found. He relied upon the credible testimony, as he states, of New West experts, Dr. Breuer and Dr. Gould. Dr. Breuer stated that there was sufficient MTBE in the soil moisture at the time of the test to account for all the MTBE that was later reported. And Dr. Gould did his own analysis of the travel time. And he said the concentrations from a release that would have occurred during Exxon's ownership would have continued to build for seven years. And Dr. Searcy actually, in his own way, supported Dr. Gould because he ran his test. He had his own computer model that he ran when trying to show that there was a new release during New West's operations. But his own computer model showed that concentrations continued to increase during the two-year period that he ran his report. Now, he only ran his report for two years. But Dr. Gould took the identical data that Mr. Searcy used and then ran the report out for 20 years and found that if you use Mr. Searcy's data, concentrations continue to increase for 10 years in the ground water. So Dr. Gould's testimony supports that there was sufficient contamination at the time Exxon transferred the station to account for the contamination. Mr. Searcy's own computer models support that conclusion itself. Judge Shub was well within his rights to rely on this evidence to support his findings of fact. Therefore, there wasn't clear error on Judge Shub's part in that regard. Additional information that would support Judge Shub's argument or finding that there was no new release was the fact that right after New West acquired the station, it did shut it down and put in brand-new equipment, top-of-the-line equipment, new container boxes, new monitoring equipment, new dispensers. There was also evidence at trial that Mr. Baines also put in new equipment and upgraded the equipment while he had it. Now, the new monitoring alarm that was in there was very sensitive and would have detected additional releases. Mr. Searcy. I have a question. Yes. Do you think any of, for any of these purposes, does one of the arguments that your opponent made was that everything Judge Shub decided was sitting on top of his finding with regard to the levels versus amounts question, and therefore was essentially infected by it so that his findings can't be divorced from that issue? I mean, when he went through all of this, he was essentially saying the reason why Exxon didn't meet its burden of proof is because it didn't prove, ultimately, because it didn't prove the amounts of anything that was released later on. And so I guess I'd like to know whether that sort of infection problem is true. I believe that what Judge Shub was relying on in determining that amount was trying to interpret the intent of the parties as to who would bear responsibility for cleaning up contamination. Exxon's position is that New West was responsible for cleaning up Exxon's own contamination. No, I understand that. But what I'm asking you is when, for example, he found that the expert was not credible with regard to whether there was a, what caused the release that was found later, did that finding in any way depend on the fact that Exxon wasn't able to demonstrate the amount of any release, for example, that occurred later? No. Judge Shub's decision with respect to amount doesn't carry over into the finding of whether or not there was a new release. Judge Shub was looking at the evidence presented by Exxon to show there was a new release, which, again, were reported in terms of concentration. And he wasn't saying I'm not going to listen to that at all anyway because it's only in concentration. Yes. He didn't say, well, you have to prove the amount of a new release. He was just looking at the question of whether or not there was, in fact, a new release proven by Exxon and found that Exxon failed to carry its burden there. Okay. Anything else? Well, I would summarize in saying that with respect to the damage issue, I think Judge Shub was correct in finding that because there was no new release, Exxon was not entitled to any damages. And I also agree with Judge Shub's alternative argument that even if Exxon had proven there was a new release, Exxon failed to carry its burden of proving its damages because Exhibit 73 was nothing but a forecasting model and Exxon's own witnesses were unable to provide any description or identification of the cost of the components which Judge Shub could use to determine damages itself. With that, I'll relinquish the rest of my time and thank Your Honors and say that I believe that the Court should uphold Judge Shub's decision. Thank you very much. Thank you. By the time Judge Shub got to a determination of whether damages or a new release had occurred, he had already decided that under his interpretation of the contract, it was Exxon's obligation to show the exact mass or volume that was in the ground at the time of the contract, the close of escrow. That Exxon had an additional obligation to determine the source of that contamination. And lastly, that then the third part of what ExxonMobil had to show was that there was no the increases were not attributable to Exxon in the past. And so respectfully, by the time he got there, he had already put three additional burdens on that had nothing to do with the contract. Now, when it comes back to this issue, I think it's important that the Court look at Section 18B of the contract because it is a release of ExxonMobil by the purchaser for contamination irrespective of whether it was caused before or after the close of escrow. And I think that for the purposes of what we're talking about here, that's important. Are you talking about this is any release or 18B is in relation to any release or discharge of hazardous substances on the property after the closing date? Yes, even if caused by Exxon. So that was? Well, New West's theory is that the spike is a new release caused by Exxon's activities before the close of escrow. Because doesn't Exxon agree in other sections to be responsible for cleanup at its remediation activities? Yes. Yes. Yes, Your Honor. How released by Exxon would there be other than its remediation activities? Well, New West argues that this is contamination that magically appeared that had been there the whole time. That's what they're actually saying. Its contaminant theory is it was in the soil, and so it gets recontaminates the groundwater as the groundwater level fluctuates. I mean, that's not a new release. That's, I mean, from the soil to the groundwater maybe. But it's not like from. Legally it is a new release. If you have found 2,800 parts per million and you are monitoring that, and it goes to 3,200, 3,500, Exxon's not saying that's not part of the same release. But when it goes to an order of magnitude, that constitutes a new release that you have to give new notice to the government because the concentration levels have greatly increased the maximum contaminant levels. These concentration spikes happened 19 months after New West Petroleum had the site and three and a half years after they had the site. There was credible evidence that was disregarded, that that was the result of the ongoing operations that had nothing to do with ExxonMobil. ExxonMobil tried to do the right thing, wants to do the right thing, which is to clean up what was found in the ground that it caused at the time of close of escrow. And we respectfully submit that the court erred in holding the way it did below. Thank you very much. Thank you, counsel, for a useful argument in a difficult case. ExxonMobil v. New West is submitted.
judges: Goodwin, Berzon, Ikuta